# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

Case No. 19-20362-CR-WILLIAMS/TORRES

UNITED STATES OF AMERICA,

      Plaintiff,

v.

SHAWN MICHAEL WRIGHT,

      Defendant.

_____/

## REPORT AND RECOMMENDATION
## ON DEFENDANT'S MOTION TO SUPPRESS

This matter is before the Court on Shawn Michael Wright's ("Defendant") motion to suppress physical evidence protected under the Fourth Amendment of the United States Constitution.   [D.E. 17].   The United States of America (the "Government") responded to Defendant's motion on February 14, 2020.   [D.E. 29]. An evidentiary hearing was held on this matter on February 18, 2020,[1] and both parties submitted supplemental briefs on February 19, 2020.   [D.E. 31, 32]. Therefore, the motion is now ripe for disposition.   After careful consideration of Defendant's motion, the Government's response in opposition, the testimony of the

---

[1]    On February 4, 2020, Judge Kathleen M. Williams referred Defendant's motion to the undersigned Magistrate for disposition.   [D.E. 20].

witnesses, the oral arguments of counsel, and the supplemental briefs, the Court recommends that Defendant's motion be **GRANTED** for the reasons set forth below.

## I.   FINDINGS OF FACT

On December 12, 2018, the Hollywood Police Department initiated an investigation into two occupied dwelling burglaries, one that included a sexual battery within the residence.   Defendant was subsequently identified as a person of interest to these crimes, and law enforcement also discovered that Defendant had an active arrest warrant from the state of Michigan for the separate crime of home invasion.

On the morning of December 18, 2018, detectives from the Hollywood Police Department, with the assistance of personnel from the Miami-Dade Police Department, coordinated to canvas an area Defendant was believed to frequent in Miami-Dade County.   The team of officers consisted of eight to nine undercover units and a handful of marked police vehicles.   The law enforcement team knew Defendant's date of birth and what he looked like based on a photograph they had of him.   Surveillance teams began looking for him.   Knowing what Defendant looked like, the law enforcement team spotted Defendant leaving his hotel room, number 105 at the Sun N Surf Inn, at approximately 8:30 a.m. while Defendant walked towards a nearby gas station.

The law enforcement team then approached Defendant at the gas station sometime between 8:30 a.m. and 8:50 a.m. to arrest him.   One of the arresting

officers was wearing a body camera, but only recorded forty-five seconds of his interaction with Defendant.   The video starts at approximately 8:50 a.m. and shows at least five officers standing above Defendant while he is handcuffed and sitting on the ground leaned up against a gas pump.   Before the video quickly ends, it shows another officer removing the contents of Defendant's wallet during a search incident to arrest.

The officers confiscated from Defendant's wallet his hotel key card and found photo identifications of other people, but not a photo identification of Defendant. The officers then asked Defendant his name to confirm his identity.   Defendant initially provided the officers with a false name, but after further questioning from the officers, he provided his real name and date of birth.   At that point, the officers were confident they arrested the correct person.   Defendant was eventually placed in the back of a police car.

While Defendant was arrested, maybe while handcuffed on the ground of the gas station or in the back of the police car, Defendant allegedly told the officers that he had "medical paperwork" in his hotel room that could help confirm his identity. The officers claimed they wanted to review the "medical paperwork" so they could further verify the identity of Defendant even though the alleged paperwork did not contain a photograph of Defendant.   Defendant then purportedly requested that the officers allow him to retrieve the medical paperwork.   While handcuffed in the back

of the police car, Defendant was driven by the officers to his hotel room located about a half-a-mile away from the gas station.

The Miami-Dade Detective who apparently took the lead in the investigation from that point testified at the hearing.   Detective Jose Rodriguez ("Detective Rodriguez") testified that the officers went to the hotel room at Defendant's request. Suffice it to say that his testimony regarding the details of the events that followed was, at best, murky.   His testimony was not supported by any other officer, by any body cam footage, or memorialized with a written consent form signed by Defendant. Nevertheless, the officer attested that the officers were allowing Defendant to return to the room so that Defendant could produce identification information to confirm what the officers already knew.   Once outside Defendant's hotel room, they did not unhandcuff Defendant to let him open his room door.   Defendant remained handcuffed.   Instead the officers opened the door using Defendant's key card while Defendant, for his "safety," was kept to the side handcuffed.[2]   The officers were worried about Defendant's and their own personal safety because they felt Defendant might be "setting them up."

Upon opening the door with guns drawn, Detective Rodriguez claims that he immediately smelled a strong odor of marijuana and could see marijuana in plain

---

[2]      Detective Jose Rodriquez could not remember if the officers confirmed with the hotel's front desk that room 105 was registered in Defendant's name before or after law enforcement initially approached the door.

sight while standing outside the open room.[3]   Detective Rodriguez and others then conducted a protective sweep of the room to ensure no other individuals were concealed within.   After determining no one was in the room, Detective Rodriguez sealed the room and then slowly prepared a search warrant for the hotel room. Detective Rodriquez testified that the initial search and entry into the room occurred sometime between 8:00 a.m. and 9:00 a.m.   He then submitted the five-page search warrant to a state judge via email at 4:13 p.m.

Curiously, law enforcement never let Defendant show them where in the hotel room the medical paperwork was located.   Instead, Detective Rodriguez claims he waited for the search warrant to be authorized before further searching the room. Yet the property sought in the search warrant only included items related to narcotics or drug abuse; it did not include property related to Defendant's alleged prior crimes in Hollywood, Florida or Michigan nor did it make any reference to his "medical paperwork."[4]   Once the search warrant was authorized, law enforcement conducted

---

[3]   The Court notes that the search warrant contradicts the timeline of events testified to by Detective Rodriguez.   The warrant states that Detective Rodriguez first smelled marijuana before opening the hotel room door.   This is not the only fact proffered by the Government that is inconsistent.   As a result, the Court does not provide substantial weight to inconsistent facts provided by the Government.

[4]   The warrant listed the property sought as "marijuana, and/or other illegal narcotics, drug paraphernalia, and/or firearms, magazines, projectiles, spent casings, ammunition, holsters, and/or other firearm paraphernalia, and/or currency, titles, receipts, and other documents and records evidencing illegal activity, or that which would lead to the identification of persons responsible for the unlawful possession or distribution of controlled substances."

a search of the hotel room and discovered a firearm and ammunition and evidence connecting Defendant to his alleged previous crimes.   The potential medical records that could confirm Defendant's identity were never found.   On September 27, 2019, Defendant was indicted for one count of Possession of a Firearm and Ammunition by a Convicted Felon.

## II.     ANALYSIS

Defendant's motion aims to suppress the firearm and ammunition that were found during the search of his hotel room that occurred after the search warrant was authorized.   Defendant argues that the probable cause supporting the warrant was based on evidence that was discovered during an unlawful entry into Defendant's hotel room.   According to Defendant, law enforcement initially opened his hotel room without his voluntary consent.   The Court finds that the Government has failed to meet its burden that Defendant provided consent to open his hotel room door, and even if Defendant provided consent, it was not voluntarily given based on the circumstances.

Because the attesting officer, Detective Rodriguez, had no first-hand knowledge of Defendant's alleged prior crimes, the Court also does not find that the search warrant was supported by appropriate probable cause based on the alleged prior crimes of Defendant.

**A.**   ***Defendant Did Not Consent to Detective Rodriquez Opening his Hotel Room Door***

"The Fourth Amendment protects individuals from unreasonable search and seizure." *United States v. Purcell*, 236 F.3d 1274, 1277 (11th Cir. 2001).   An individual staying in a hotel room has the same protections as a person staying in his home.  *See Stoner v. California*, 376 U.S. 483, 490 (1964); *United States v. Ramos*, 12 F.3d 1019, 1023 (11th Cir. 1994) ("Use of a motel room for lodging provides the same expectation of privacy as does a home.").   Warrantless searches and seizures inside a person's home or one's hotel room are presumptively unreasonable.   Without a warrant, "a search is reasonable only if it falls within a specific exception to the warrant requirement." *United States v. Watkins,* 760 F.3d 1271, 1278 (11th Cir. 2014) (quotation marks omitted).

One such exception is a warrantless search or entry based on valid voluntary consent.   *Watkins,* 760 F.3d at 1279; *United States v. Garcia*, 890 F.2d 355, 360 (11th Cir. 1989).   The government bears the burden, by a preponderance of the evidence, that a defendant's consent was freely given and voluntary and not an acquiescence to a claim of lawful authority.   *See Florida. v. Royer*, 460 U.S. 491, 497 (1983); *United States v. Duncan*, 356 F. App'x 250, 252 (11th Cir. 2009); *United States v. Johnson,* 608 F. App'x 764, 767 (11th Cir. 2015).

"The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of objective reasonableness – what would the typical reasonable person have understood by the exchange between the officer and the suspect."

*Florida v. Jimeno*, 500 U.S. 248, 250-51 (1991).   However, "a search is impermissible when an officer does not conform to the limitations imposed by the person giving consent."   *United States v. Zapata*, 180 F.3d 1237, 1242 (11th Cir. 1999).

The "plain view" exception to the Fourth Amendment warrant requirement permits a law enforcement officer to seize what is incriminating evidence or contraband when it is discovered in a place where the officer has a right to be. *Washington v. Chrisman*, 455 U.S. 1, 5-6, 8 (1982) (finding that narcotics in a dorm room were in "plain view" when observed by an officer standing in the hallway outside the dorm room).   If an arresting officer has an express invitation, he can accompany an arrestee into his home.   *See id.* at 6 (holding that it was not a violation of the Fourth Amendment for an officer to follow an arrestee to the entrance of his dorm room); *United States v. Harness*, 453 F.3d 752, 754 (6th Cir. 2006) (noting there was consent to enter a defendant's home when the arresting officer asked the defendant if he "needed anything . . . inside [his] house" after defendant was arrested on his front porch, and the defendant responded that he needed his "wallet, keys and cigarettes," and then the officers followed him inside once the defendant entered his house); *United States v. Butler*, 980 F.2d 619, 620 (10th Cir. 1992) (finding consent to enter a defendant's home when an officer asked the defendant if he had any shoes to wear because he was barefoot sitting outside his home, and the defendant said he had some in his home and then led the officer inside); *cf. Watson v. City of Bonney Lake*, 506 F. App'x 555, 556-57 (9th Cir. 2013) (concluding officers violated the scope of

defendant's consent when "[a]fter receiving an initial verification of [defendant's] identity, the officers . . . instructed [defendant] to retrieve his driver's license from his home to prove [whom he was]," and when defendant was exiting his home with the wallet, officers met him at the door and then began to search the home after pushing him inside).

Here, there is no disagreement that the narcotics found in Defendant's hotel room were in plain view once Detective Rodriguez opened the door.  And under *Chrisman*, Detective Rodriguez had the right to follow Defendant if *he* entered his own hotel room for the purpose of obtaining identification.  455 U.S. at 7 ("It is not 'unreasonable' under the Fourth Amendment for a police officer, as a matter of routine, to monitor the movements of an arrested person, as his judgment dictates, following the arrest.").  But, critically, the preponderance of the evidence shows that these officers never accompanied Defendant into his hotel room.  The Government merely relies on subjective conclusions that Defendant consented to the officers opening his hotel room door and entering without him.

For instance, the Government believed that Defendant provided "limited verbal consent for law enforcement to open his hotel room door and retrieve paperwork that would confirm his identity."  However, the Government does not identify any specific evidence that shows Defendant gave verbal consent *of any kind* for the officers to look for Defendant's paperwork in his hotel room.  The officers thus

unlawfully opened the hotel room door, purportedly to look for that paperwork, while Defendant was kept to the side handcuffed and under arrest.

The record is also sparse with details surrounding the circumstances of how and when Defendant asked to retrieve the medical documents that could prove his identity.   We do not know which officer Defendant made this request to, if it occurred in the police car, at the gas station, or possibly later, what type of conversation or questioning took place immediately prior, if they discussed where the identifying documents could be found in the room, or how far Defendant was from the room when they entered it.   So, in other words, we have no tangible evidence of either verbal or implied consent that Defendant purportedly gave to justify a warrantless entry into the room.   Instead the preponderance of the evidence supports our finding that, at best, we have clear acquiescence to lawful authority in not objecting to the opening of the hotel room door.   That is very different from express consent.   *Compare United States v. Edmondson,* 791 F.2d 1512, 1515 (11th Cir. 1986) (FBI agents investigating a bank robbery surrounded suspect's apartment, drew their weapons, knocked on the door yelling, "FBI. Open the door," which caused suspect to open door, step back, and placed his hands upon his head; this was deemed evidence of "acquiescence to a show of official authority."), *with United States v. Ramirez-Chilel,* 289 F.3d 744, 751 (11th Cir. 2002) (implied verbal consent present where defendant only yielded right of way to officers who did not have weapons drawn, did not surround property in large

numbers, and who only asked if there was evidence of counterfeit documents at the residence).

The objective facts also do not demonstrate that a reasonable officer would believe that Defendant was providing consent to enter his hotel room without him. The evidence shows that Defendant said he could provide identification documentation that was back in his hotel room; he was then taken to the hotel room number 105, which number the officers already knew from watching him earlier in the day, while he was in the back of a police car; and then the officers used the key card they took from him earlier to open the door while he was kept handcuffed and to the side of the room.   These facts do not show that Defendant verbalized that they could enter and search his room for his identification documents.   Nor is there any evidence that the officers asked to enter or search his room and that Defendant agreed to such explicit request.

The Government contends that the fact Defendant provided his key card to the officers is evidence he impliedly consent for the officers to open the hotel room door. Yet the record shows that the officers confiscated the key card from Defendant during their search incident to arrest.   Forcefully obtaining the key card before Defendant allegedly provided his verbal consent to the search does not support that the officers were objectively reasonable in their conclusion that Defendant was providing implied consent to enter his hotel room under those circumstances.[5]

---

5      Detective Rodriquez's search warrant does state that Defendant "advised to

The Government also argues that Defendant failed to provide any evidence to contradict the government's evidence that he gave verbal consent by Defendant not testifying.   That contention also fails.   In the first place, it is inconsequential when the government has failed to meet its initial burden and provide enough evidence that Defendant gave consent to search his hotel room.   Thus, there was nothing for Defendant to contradict by testifying.   The officer's testimony, even if believed, did not reveal tangible evidence of express consent necessary for the government to meet its burden of proof by the preponderance of the evidence.

In the second place, this is a case where we can also find that the officer's testimony may be discounted under the rule that testimony that is "exceedingly improbable" or "contrary to the laws of nature" need not be accepted.   *See, e.g.,* *Ramirez–Chilel,* 289 F.3d at 749. Had the officer testified that the Defendant wanted to show his arresting officers documents from his room that supported his claim that he was not the individual they were looking for, then his version of the events would have been more probable and thus credible.   His testimony was the exact opposite. Having confronted the Defendant with his true name, having obtained from the Defendant a concession that he was in fact the Shawn Michael Wright they were looking for, the Officers allowed Defendant to go back to his room to produce "medical

---

use the key card he was carrying to open the door and that no one was in the room." But Detective Rodriquez's testimony failed to corroborate this fact, and it is contradicted by his testimony that Defendant asked to be able to go into the room himself to retrieve the identification documents.

paperwork" that could verify that he was Shawn Michael Wright.    Highly improbable indeed.

But we need not go as far as finding that the sole officer who testified on this point, Detective Rodriguez, was not telling the truth.   To us, he seemed to testify in good faith.   We thus conclude that *he* believed that he had gotten consent out of the Defendant based upon the lack of objection that he received from Defendant when the topic of going back to the hotel room came up.   The officer likely interpreted this silence as implied consent.   That is more probable and not based upon the fact the officer actually never explained in any persuasive detail what questions he posed to the Defendant that led to Defendant's verbal consent back.   The testimony was entirely conclusory and indefinite.   The officer's testimony thus left us wanting more. The government never provided it.   And this failure to corroborate the extent of the verbal consent is fatal to the government's position.   *Cf. Johnson,* 608 F. App'x at 768 (verbal consent found where agents "had a hotel employee knock on the door to Room 509 under the pretense of room service and when the door opened, the employee stepped away and the agents identified themselves, exhibited their credentials and explained they were conducting a follow-up investigation. [T]he conversation was very cordial, Cooper invited them in, walked over to the bed and sat down.").

The ultimate problem for the government in this case is that our determination cannot be based on the subjective impression of this particular officer.   It must be based on a determination based on the totality of the circumstances evidencing

13

sufficient indicia of consent to a reasonable officer. *See, e.g., Schneckloth,* 412 U.S. at 248-49; *Florida v. Jimeno*, 500 U.S. at 250-51. Under that objective measure, the government's theory of express or implied consent does not pass muster. The handcuffed Defendant, who was questioned, arrested, and delivered back to his hotel room, did not provide reliable express or implied consent for the entry into his protected room. We do not have footage of express consent. We do not have a signed consent form (which is typically the case in cases involving Miami-Dade investigations). We do not have any tangible evidence of reliable consent other than acquiescence to lawful authority. Hence, whether the subsequent entry was in good faith or not, the entry was unlawful.

In sum, the government has failed to show by a preponderance of evidence that Defendant provided consent to open and search his hotel room without him present. The motion should thus be Granted on this basis alone.

### B. *If there was Consent, it was not Voluntary*

Even if Defendant provided express or implied consent to the officers to open his hotel room door, it was not voluntarily provided based on the totality of the circumstances.

One exception to conduct a search without a warrant is obtaining voluntary consent. *Garcia*, 890 F.2d at 360. "Voluntariness is a question of fact to be determined from all the circumstances." *Ohio v. Robinette*, 519 U.S. 33, 40 (1996) (quoting *Schneckloth v. Bustamonte,* 412 U.S. 218, 248-49 (1973). A court must

14

"analyze the facts and balance the suspect's right to be free from coercive treatment with the needs of the government to conduct legal searches." *United States v. Rodriguez Perez*, 2020 WL 105000, at *3 (11th Cir. Jan. 9, 2020).

Several factors, each non-dispositive, may be considered in deciding whether or not there was voluntary consent. These factors include defendant's custodial status, the presence of coercive police procedure, the extent and level of the defendant's cooperation with police, the defendant's awareness of his right to refuse to consent to the search, the defendant's education and intelligence, and, significantly, the defendant's belief that no incriminating evidence will be found. *Compare id.* at *4 (noting that the facts of a defendant being detained at a gas station and placed in handcuffs are factors showing that a defendant was somewhat pressured), *and United States v. Pena-Saiz*, 161 F.3d 1175, 1177-78 (8th Cir. 1998) (holding consent was not voluntary when officers never informed defendant that she was free to leave or that she did not have to answer their questions, they repeatedly requested to pat-her-down, and kept her in custody for twenty-one minutes before she consented), *with United States v. Espinosa-Orlando*, 704 F.2d 507, 510 (11th Cir. 1983) (finding consent was voluntary when agents asked defendant in a conversational tone, whether he gave permission to search his vehicle that was in front of him and defendant said "yes," and noting that facts that could show consent was not voluntary could include the defendant being handcuffed, placed in a police vehicle, or transported away from the location of the arrest).

15

Here, each factor favors finding that Defendant's consent was not voluntary. Defendant was arrested, handcuffed, and placed in the back of a police car.  There were at least ten officers involved in his arrest with at least five surrounding him while he was on the ground outside the gas station.  Defendant did not initially cooperate with the police when he provided a false name.  There is no evidence Defendant was given a *Miranda* warning nor that he knew he could refuse consent to a search of his hotel room.  The Government provides no evidence of Defendant's education or intelligence level.  Defendant should have also believed that incriminating evidence would have been found as Detective Rodriguez testified that there was a felony amount of marijuana on the dresser that was visible as soon as the door was opened.  The room also contained a firearm, ammunition, and what appears to be a bulletproof vest.

Moreover, the Government never provided an exact time when Defendant provided his alleged consent and provides an unreliable time when it initially entered the hotel room.  The Court can only find that Defendant was arrested before 8:50 a.m., and the search warrant was submitted at 4:13 p.m.  Thus, it is possible that Defendant was held in custody for a significant time before he consented to the limited search of his hotel room.  Each minute that passes in custody is further evidence that the consent may be under duress.  This potential length of custody also shows that the officers had ample time to have Defendant sign a Consent to Search Form.  Couple this with the non-emergency reason to retrieve the alleged

16

identification documents – the officers already had a photograph of Defendant and date of birth to confirm his identity – and there is no logical nor persuasive reason that the officers did not have time to obtain express voluntary consent in writing.

The Government mainly relies on one case in arguing Defendant's limited consent was voluntary based on the circumstances.   In *United States v. Garcia*, the defendant was arrested outside his home and then placed on his living room couch and read his *Miranda* rights.   890 F.2d at 358.   At first, the defendant only consented to a limited search of his home, but after the officers did not accept this consent and said they would attempt to obtain a search warrant, the defendant said, "go ahead and search the house."   *Id.*   The court in *Garcia* noted that the defendant was not "lying on the ground . . . with four agents towering over him" like in *Espinosa-Orlando*, and that the defendant should have felt comfortable sitting in his own living room.   *Id.* at 361.   But the court then noted that because there were fourteen agents involved in his arrest and that he was handcuffed, the defendant was under some pressure.   Ultimately, these facts in *Garcia* were not enough for the appellate court to find that the district court was clearly erroneous in finding the defendant's consent to search his home was voluntary.   *Id.* at 359.

*Garcia* is clearly distinguishable from this case.   To begin with, Defendant was handcuffed and lying on the ground with at least five agents standing above him while they went through the contents of his wallet.   It is not clear if Defendant was on the ground when he gave consent or if he was in the back of the police car, but

17

neither is equivalent to sitting on his living room couch.   Next, the two facts that show there was some pressure in *Garcia* are also present here: there were at least a double-digit number of officers involved in his arrest and he was handcuffed.

All the specific facts noted in *Garcia* and *Espinosa-Orlando* that would favor a finding that consent was not voluntary are present here: Defendant was handcuffed, placed on the ground outside of a gas station, had more than four officers towering above him, he was placed in the back of a police car, he was transported away from the place of the arrest, a large amount of agents were involved in his arrest, and he was not given *Miranda* rights.

The best piece of objective evidence for the Government that Defendant consented to the search voluntarily is the possibility that he told the officers to use his key card to access the room once they arrived at the room.   If this is true, however, this means that Defendant only provided consent after he was driven away from where he was arrested, escorted to his hotel room, all while he was still handcuffed and surrounded by police officers.   This is even strong evidence that his consent was not voluntary and instead amounted to acquiescence to lawful authority. *See Edmondson,* 791 F.2d at 1515.

To boot, no evidence was presented by Detective Rodriguez or anyone else at the scene as to the method and manner by which the Defendant provided his express consent.   We have no evidence that he was not threatened or intimidated, as to his specific interactions, or even as to whether he even ever engaged in conversation.

We only have the conclusion that voluntary consent was given based on the Defendant's curious request to produce paperwork to verify what the officers suspected.  That is hardly the stuff that voluntary consent is made of.  *Cf. United States v. LeBeau,* 867 F.3d 960, 971 (8th Cir. 2017) ("Although the facts that Gerald was handcuffed and was not given *Miranda* warnings weigh in Gerald's favor, other facts support the court's finding of voluntariness: The agents did not threaten or intimidate Gerald, the agents told Gerald that he was not under arrest and that they wanted to ask him questions about the woman in his room, the agents informed Gerald that he did not have to speak with them, Gerald was cooperative with the agents and engaged them in conversation, . . .").

We must also consider the need of the Government to conduct legal searches.  *See Rodriguez Perez*, 2020 WL 105000, at *3.  First, the officers already had a photograph of Defendant and Defendant confirmed his date of birth; Detective Rodriguez testified that this information was normally sufficient to confirm an identity of a suspect to make an arrest.  Second, the officers had evidence that Defendant had false identifications in his wallet, so it was reasonable to think any further identification documentation provided by Defendant could also be false, so even it did really exist, it probably would not have been helpful to confirm his identity anyway.  Third, the officers had ample time to have Defendant sign a Consent to Search Form as there was no exigent circumstances present.  Finally, the officers were concerned about being "setup" and thought there could be gun fire coming from

19

the hotel room once they entered.   As a result, the need for the officers to conduct the search here was very low as there was no reason to bring Defendant to a potential gun fight to retrieve unnecessary identification documents.

Considering the specific facts of this case, the analysis of the factors discussed above,  combined with the low need of the officers to conduct the search, the Court cannot find there is a preponderance of evidence that Defendant's consent was voluntary.   As a result, the Government has failed to meet its burden that the consent exception to the warrant requirement does apply.

### C.    *The Search Warrant Is Not Supported by Probable Cause*

The Government finally argues that the authorized search warrant that led to the discovery of the firearm and ammunition was still supported with appropriate probable cause as it did not rely upon post-entry of the hotel room observations.   A reading of the property sought in the search warrant shows that the search warrant was entirely based on Detective Rodriguez's observation of marijuana and drug paraphernalia during his unlawful entry into the hotel room.   Further, Detective Rodriguez could not attest to any of the facts related to Defendant's alleged prior crimes because he had no first-hand or investigatory knowledge of them. Accordingly, the search warrant was not supported by probable cause prior to the Government's unlawful entry into Defendant's hotel room.[6]

---

[6]    We note that many of these facts may have been relied upon in the issuance of a second search warrant related more directly to the Hollywood investigation.   Our conclusion here obviously has no bearing on any proceedings or challenges made in

### III.      *CONCLUSION & RECOMMENDATION*

For the foregoing reasons, the Court **RECOMMENDS** that Defendant's motion to suppress be **GRANTED**.   The evidence obtained as a product of the initial unlawful entry should be suppressed.

Pursuant to Local Magistrate Rule 4(b), the parties have until February 24, 2020, to file written objections, if any, with the District Judge.   Failure to timely file objections shall bar the parties from *de novo* determination by the District Judge of any factual or legal issue covered in the Report *and* shall bar the parties from challenging on appeal the District Judge's Order based on any unobjected-to factual or legal conclusions included in the Report.   *See* 28 U.S.C. § 636(b)(1); 11th Cir. Rule 3-1; *see, e.g., Patton v. Rowell,* 2017 WL 443634 (11th Cir. Feb. 2, 2017); *Cooley v. Comm'r of Social Security,* 2016 WL 7321208 (11th Cir. Dec. 16, 2016).

**DONE AND SUBMITTED** in Chambers at Miami, Florida, this 21st day of February, 2020.

/s/ *Edwin G. Torres*
EDWIN G. TORRES
United States Magistrate Judge

that case.   Indeed a state court prosecution for unlawful weapons possession may be viable in that case.   For our purposes, however, we do not rely on the second search warrant given that the Government did not present any inevitable discovery or independent source theory in this case.   The government did not introduce any evidence with which we could make such a finding and thus those issues are waived. The government only relied on the consent exception to the warrant requirement for the initial entry, which exception does not apply here.